**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| v. | ) | Case No. 20-cr-605 |
| | ) | |
| REFUGIO AVILA, | ) | Hon. Steven C. Seeger |
| _____ | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Officers from the Chicago Police Department arrested Defendant Refugio Avila after they found a gun on his person during a traffic stop. The United States later charged him with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Avila, in turn, moved to suppress.

For the reasons stated below, the motion to suppress is denied.

**Background**

This Court presided over an evidentiary hearing on the motion to suppress, and it spanned two days. *See* 5/6/21 Tr. (Dckt. No. 54); 5/7/21 Tr. (Dckt. No. 55); *see also* 5/6/21 Order (Dckt. No. 43); 5/7/21 Order (Dckt. No. 44). Three witnesses testified, and the transcripts span more than 300 pages. The government called two police officers who effectuated the traffic stop, Officer Anthony Fosco and Officer Robert Cabello. Defendant Avila briefly testified, too.

The parties also submitted a number of exhibits. *See* Gov't. Ex. List (Dckt. No. 42); Def.'s Ex. List (Dckt. No. 41). Most notably, the government presented video from the incident, including footage from body-worn cameras from Officer Fosco and Officer Cabello. *See* Fosco Video, Gov't. Ex. 1 (Dckt. 42-1); Cabello Video, Gov't. Ex. 2 (Dckt. No. 42-2). Avila filed a few declarations to support his motion. *See* Hernandez Dec. (Dckt. No. 18-5); Avila Dec. (Dckt.

No. 18-6). The parties also submitted several helpful maps and photos of the area, to set the scene. *See, e.g.*, Gov't. Ex. 3 (Dckt. No. 42); Def.'s Exs. 3, 4, 8, 14–16, 22 (Dckt. No. 41).

The Court finds the following facts based on the evidence in the record, including the testimony, the video from the two bodycams, and the remaining exhibits. *See* Joint Stipulation of Admitted Exhibits (Dckt. No. 45).

On the afternoon of June 17, 2020, Officers Fosco and Cabello were on duty and on patrol in Chicago's west side. *See* 5/6/21 Tr., at 18:19-24. They were part of the 10th District, an area that includes North Lawndale and Little Village. *See* 5/6/21 Tr., at 14:11 – 15:9; 5/7/21 Tr., at 11:4 – 12:2.

Officer Cabello testified about the high crime in the neighborhood. *See* 5/7/21 Tr., at 48:14-17. "[T]here is a lot of gang problems in our district, a lot of gang-related shootings, stolen cars, robberies. We mostly focus on those types of crimes and make stops if we have suspicion or probable cause." *See* 5/6/21 Tr., at 16:21-25. Many shootings involved gang members driving in cars through rival territory to commit acts of violence. *See* 5/7/21 Tr., at 53:18-23.

Officers Fosco and Cabello were members of a tactical team that focused on high-crime areas inside the district. *See* 5/6/21 Tr., at 15:10-14. Officer Cabello explained: "A tactical officer is proactive policing. We want to stop crime before it happens. We want to make sure communities are safe. So, in order to do that, we have to be proactive." *See* 5/7/21 Tr., at 11:8-10. He added: "And what we do there is we just saturate that area with as many police officers as we can to be proactive. We do traffic stops, street stops, talk to the community, try to get as much info as we can. And if arrests do come up with it, once again, it's stopping the violence." *See* 5/7/21 Tr., at 11:17-21; *see also id.* at 13:5-14.

That afternoon, they were in the south end of the district, in a gang conflict zone between the Latin Kings and the Satan Disciples. *See* 5/6/21 Tr., at 17:3-8; 5/7/21 Tr., at 12:23 – 13:1 They were on a so-called "focused patrol," in an attempt to stem the tide of violence. *See* 5/6/21 Tr., at 46:21 – 47:9; 5/7/21 Tr., at 13:2-14.

At the time, there was an uptick in shootings in that area between rival gangs. *See* 5/6/21 Tr., at 17:11-19. The goal was to have high visibility, increase the police presence, and stop violence before it happens. *See* 5/6/21 Tr., at 17:20 – 18:3, 46:21 – 47:9; 5/7/21 Tr., at 11:11-21.

Traffic stops were part of the focused patrol. *See* 5/7/21 Tr., at 13:15-17, 52:18-24. Officer Fosco explained: "And our main goal was to have high visibility. You know, a lot of the shootings involved vehicles going by, so it would kind of be a deterrent if we're in the area making stops, if we have probable cause or, like I said, we're suspicious, street stops. So our goal was just to be in the area for high visibility and corrective policing if the opportunity presents itself." *See* 5/6/21 Tr., at 17:21 – 18:3.

The story begins with Officers Fosco and Cabello in an unmarked Ford Explorer on West 25th Street. *See* 5/6/21 Tr., at 18:19-24. Officer Fosco was the driver, and Officer Cabello was in the front passenger seat. *See* 5/6/21 Tr., at 22:22-24; *see also* Fosco Video, at 00:00-10; Cabello Video, at 00:00-10.

The unmarked vehicle was not equipped with a camera. *See* 5/6/21 Tr., at 19:3-4; 5/7/21 Tr., at 20:1-10. But each officer wore a bodycam, and they captured the eventual traffic stop.[1] *See* 5/6/21 Tr., at 18:25 – 19:2; Fosco Video, Gov't. Ex. 1 (Dckt. No. 42-1); Fosco Video, Def.'s

---

[1] According to the timestamps, the officers activated the bodycams at 2:45 p.m. *See* Fosco Video, at 1:59; Cabello Video, at 1:59. That's when the audio starts. But the video footage begins at 2:43 p.m., two minutes earlier. There is no audio during the first two minutes because a bodycam automatically captures video, but not audio, for the two minutes before the bodycam is activated. *See* 5/6/21 Tr., at 25:23 – 26:12, 65:25 – 66:14. So, a bodycam will record the prior two minutes of video, but not audio.

Ex. 9 (Dckt. No. 41-9); Cabello Video, Gov't. Ex. 2 (Dckt. No. 42-2); Cabello Video, Def.'s Ex. 10 (Dckt. No. 41-10).

They were parked on 25th Street (which runs east-west), at the corner of 25th and South Western Avenue (which runs north-south). The car was facing east on 25th, just before the intersection with Western Avenue.[2] *See* 5/6/21 Tr., at 55:11 – 57:2, 59:12-14; Def.'s Ex. 16 (Dckt. No. 41-16); Def.'s Ex. 22 (Dckt. No. 41-22).

The officers were parked across the street from Las Islitas Seafood & Mexican Restaurant, which is located on the northwest corner of 25th and Western. So, from the driver's perspective, the restaurant was to their back left. At some point, Officer Cabello exited the patrol car, entered Las Islitas, and got a drink for his partner. *See* 5/6/21 Tr., at 56:3-10; 5/7/21 Tr., at 29:2-6, 58:4-10. Officer Fosco remained behind the wheel.

Defendant Avila wasn't far away. In fact, he was in the parking lot of the restaurant, sitting in the passenger seat of a Dodge Journey minivan driven by his girlfriend, Fatima Hernandez. Hernandez was in the restaurant, getting food to go. *See* 5/7/21 Tr., at 140:6 – 148:20 (testimony of Avila). Avila saw the officers in the car, and he saw one of them get out and walk into the restaurant.[3] *Id.*

There is conflicting evidence in the record about whether Officer Cabello spotted Avila in the car. Avila testified that the officer looked directly at him, albeit through sunglasses (so Avila couldn't see his eyes). *See* 5/7/21 Tr., at 152:15 – 153:6, 155:8-24 (Dckt. No. 55). He testified that the officer looked him over, and stared him down. "He's like – we locked eye contact, me and him, you know, because it was – man, he was just staring me down. He was

---

[2] Unlike Officer Fosco, Officer Cabello did not recall ever being parked on 25th. *See* 5/7/21 Tr., at 28:21-23, 59:16 – 61:11.
[3] In fact, during the ensuing traffic stop, Avila told Officer Fosco that he had seen them by the restaurant. *See* Fosco Video, at 4:12-20.

stalking me.  He was like – he wasn't even looking where he was walking because he had his head turned looking at me, you know, the whole time he walked inside towards like – inside the restaurant." *See* 5/7/21 Tr., at 144:7-12 (Dckt. No. 55); *see also id.* at 145:9-19, 147:6-12.  Avila testified that the officer stared at him before going into the restaurant, and did so again after leaving the restaurant.  But Officer Cabello testified that he didn't see anyone outside the restaurant – and he didn't see Avila, in particular.  *See* 5/7/21 Tr., at 29:24 – 30:3, 31:13-16, 64:10-16.

Officer Cabello returned to the squad car, with a Coke in hand (his partner wanted a horchata), and sat in the passenger seat.  *See* 5/6/21 Tr., at 62:13-16.  The officers then drove off.  Officer Fosco testified that Officer Cabello didn't say anything about spotting a member of the Satan Disciples in the parking lot.  *See* 5/6/21 Tr., at 60:20 – 62:10.

They left, but they didn't go far.  They basically ended up on the other side of Las Islitas.  So, they went from sitting south of the restaurant (on 25th) to sitting northeast of the restaurant (on Western).

That is, the officers went around the block and ended up on Western Avenue, facing south.  They stopped and parked on Western Avenue, just a little north of Las Islitas, with the parking lot of the restaurant in full view.  So, they went from parked on 25th, facing east, to parked on Western, facing south.  *See* 5/6/21 Tr., at 128:10-18.

If you're a visual person, take a look at the map.  A helpful exhibit shows where they started on 25th (Position 1), and where they ended up on Western (Position 2).  *See* Def.'s Ex. 22; *see also* 5/6/21 Tr., at 62:20 – 63:18; *see also* Def.'s Ex. 15 (showing the new parking spot on Western); 5/7/21 Tr., at 69:9-23.[4]

---

[4]  Officer Cabello could not recall moving the vehicle from 25th to Western.  *See* 5/7/21 Tr., at 65:14-17.  So he does not know how they ended up on Western.  *Id.* at 65:18-21.

The officers weren't sure how, exactly, they got on Western, meaning what route they took. *See* 5/6/21 Tr., at 63:19 – 64:3, 68:20 – 69:2; 5/7/21 Tr., at 65:14-21. But it is consistent with driving east on 25th Street, crossing Western, turning left, driving north a block or two, turning left again, driving west, turning left again onto Western, and then driving south a block or so until stopping when the parking lot of Las Islitas was visible. Another possible option is a U-turn on Western. (But Avila testified that they crossed Western, heading east. *See* 5/7/21 Tr., 147:23-24.)

The main point is that the officers were parked on 25th, facing east, when Officer Cabello bought a Coke. But when he returned to the vehicle, the officers drove to another location nearby, either by circling the block or doing a U-turn. They ended up parked on Western, facing south. From that spot, they could see the parking lot from a different vantage point. *See* Def.'s Exs. 14, 15 (showing the view of the parking lot from the location of the squad car on Western).

At the hearing, the officers could not offer an explanation why, exactly, they drove around the block and parked on a different side of the restaurant. *See* 5/6/21 Tr., at 64:8-22, 142:24 – 143:2. The relocation of the vehicle is consistent with a desire to scout out the parking lot of Las Islitas, from a less conspicuous spot.

The officers didn't stay in that spot on Western for long. The bodycam video begins when Officer Fosco parked the vehicle on Western, at 2:43 p.m. *See* Fosco Video, at 0:0-13; Cabello Video, at 0:0-10. About 15 seconds later, the officers were on the move. *See* Fosco Video, at 0:30; Cabello Video, at 0:27.

They went a little south and then cut through the parking lot of Las Islitas – diagonally, heading southwest. *See* Cabello Video, at 0:27-45; 5/6/21 Tr., at 70:16-20. At the hearing, the officers could not explain why they cut through the parking lot. *See* 5/6/21 Tr., at 70:21 – 72:19,

6

99:1-14, 143:3-6; 5/7/21 Tr., at 80:12-14, 81:6-18. They then headed west on 25th, the same direction as the Dodge containing Avila and Hernandez. *See* Cabello Video, at 0:27-45; 5/6/21 Tr., at 73:14-18, 129:15-21.

The hearing included a number of questions about whether the officers intentionally followed the Dodge minivan containing Avila. Overall, the evidence supports the conclusion that the officers watched – and then deliberately followed – the vehicle containing Avila and Hernandez when they left Las Islitas, for a number of reasons. Before continuing with the story, the Court will unpack what has happened so far, and explain why this Court concludes that the officers were tailing Avila's car.

For starters, Officer Cabello had an opportunity to get a look at Avila, who was sitting in a car in the parking lot, when the officer got his partner a Coke. Officer Cabello and Avila were in the same parking lot of the same restaurant at the same time. The parking lot isn't huge – it's not Home Depot. The officer had a chance to see Avila before he returned to the unmarked police car on 25th, and before the officers circled around to the other side of the restaurant.

And Avila is noticeable. He's the type of person who might stick out and catch your eye. *See* 5/7/21 Tr., at 56:16-18. He weighs 300 pounds. *See* 5/7/21 Tr., at 55:6-9. As his lawyer put it, "he's a big dude." *Id.* at 55:6. He has a distinctive look with a goatee and a shag haircut. *See* 5/6/21 Tr., at 45:3-24. That's a haircut associated with the Satan Disciples. *See* 5/7/21 Tr., at 56:4-9. He has two face tattoos, too. *See* 5/7/21 Tr., at 56:13-15. Teardrops.

That said, in fairness, Avila might not have been as visible in the car. He's a large man, but that's probably more obvious when he's standing up than when he's sitting in a car, behind a tinted windshield. Also, Avila was wearing a baseball cap on the day in question, so the haircut

might not have been visible. And teardrop tattoos aren't easy to see, unless you're up close and personal.

Other facts support the conclusion that the officers were following the minivan. After having the opportunity to see an eye-catching person, the officers drove to a different – and perhaps less conspicuous – spot, on the other side of Las Islitas. Officer Cabello could not recall why he moved the vehicle around the block, to the other side of the restaurant. But relocating the car is consistent with a desire to surveil the scene without getting seen.

The manner of parking the car suggests that the officers wanted to look at something from an inconspicuous perch, too. When the officers parked on Western (after circling the block, or doing a U-ey), they stopped. Officer Cabello (the passenger) then motioned his hand, flipping his fingers back and making a gesture consistent with "back up." *See* Cabello Video, at 0:00-02. Officer Fosco then backed up a little, as if to make the officers less visible and less conspicuous. *See* Fosco Video, at 0:00-13; Cabello Video, at 0:03-10. That is, Officer Fosco put the car in park, and then put it back in gear, went in reverse, and backed up a few feet. *Id.*

At that point, Officer Cabello pointed at something ahead of them, possibly in the direction of Las Islitas. *See* Fosco Video, at 0:12-15; Cabello Video, at 0:09-11. He apparently wanted his partner to see something, or someone. *See* Cabello Video, at 0:09-11. And within 15 seconds, they drove in that general direction. It's unlikely a coincidence that the officers drove in the general direction where one of the officers was pointing.[5]

---

[5] Again, Officer Cabello sat in the passenger seat. He pointed at something with his right arm, and the video shows that his hand pointed at an area close to the air vent in the middle of the dashboard. *See* Cabello Video, at 00:10. He pointed forward, but the angle was a bit right to left, because the right arm gestured toward the middle of the car. If Officer Cabello were pointing at Las Islitas, his hand would have pointed closer to the direction of the air vent on the right side of the dashboard. *See* 5/7/21 Tr., at 74:8 – 75:3. Imagine if the perspective of Officer Cabello was like a clock (so, in front of him was 12:00, behind him was 6:00, his right was 3:00, and his left was 9:00). Based on the video, it looks like Officer

The departure of the officers from that parking spot is consistent with a desire to follow Avila and Hernandez, too. The officers, like Avila and Hernandez, ultimately traveled west on 25th. But the officers got there by cutting through the Las Islitas parking lot. *See* Cabello Video, at 0:26-42. That direct route was a shorter distance (as the crow flies) to the other car. They cut through the parking lot instead of driving to 25th and turning right at the intersection. Cutting through a parking lot – and thus taking the most direct route – is something you might do if you wanted to close the gap and catch up to another car.

Back to the story. The officers cut through the parking lot and drove behind the Dodge containing Avila and Hernandez, traveling west on 25th. At that point, the bodycam footage shows them driving, but it doesn't show the other car – it only captures the windshield, the side windows, and the dashboard. The officers closely followed the Dodge minivan. They were only a car length or two away. *See* 5/6/21 Tr., at 19:24 – 20:7.

They drove about two blocks. Along the way, Officer Fosco had his right hand in the middle console of the police vehicle. *See* 5/6/21 Tr., at 77:11 – 80:12. That's where the switch is to activate the flashing lights. *Id.* That placement of the hand is consistent with getting ready to pull someone over. *Id.*

Before long, they arrived at an intersection with Rockwell. Hernandez then turned right onto Rockwell, headed north. At that point, the officers were right behind the Dodge minivan, about a car length away. *See* 5/7/21 Tr., at 15:9 – 16:9, 17:22 – 18:3, 106:25 – 107:2.

That's when the officers witnessed a few traffic infractions. Hernandez used her turn signal after she came to a stop at the stop sign. *See* 5/6/21 Tr., at 19:13-19, 87:15-23, 88:16-20,

---

Cabello pointed toward 11:00, and Las Islitas was at 1:00. *Id.* That said, the view from the bodycam in this portion of the video is imperfect. The key point is that he pointed forward, give or take.

90:17-23, 132:4 – 133:22; 5/7/21 Tr., at 14:23 – 15:6, 16:11-15, 17:14-21, 82:24 – 83:3, 104:21 – 106:16. She did not use her turn signal at least 100 feet before turning. *Id.*

Hernandez also was not wearing her seat belt. *See* 5/6/21 Tr., at 19:10-12, 22:7-10, 75:6-16, 80:13-25, 129:22-25. Officer Fosco saw that Hernandez was not wearing her seat belt. He testified: "We were behind the vehicle. I could see that the driver wasn't wearing a seat belt. I could see the seat belt flapping to the left of her, and it wasn't across her body." *Id.* at 19:10-12.[6]

Officer Cabello also saw the passenger without a seat belt. *See* 5/7/21 Tr., at 16:23 – 17:8, 82:24 – 83:5, 85:19 – 86:24, 109:3-5, 110:10 – 111:20. He testified: "I noticed his seat belt was not coming across the body in an angle. I observed the seat belt coming more directly down, which alerted me that the seat belt was not on correctly." *See* 5/7/21 Tr., at 17:1-4. At the hearing, Officer Cabello acknowledged that he believed that Avila was not wearing a seat belt, but when he walked to the car, he could see that Avila was actually sitting on top of the buckled seat belt. *See* 5/7/21 Tr., at 90:11 – 92:18.

As Hernandez completed the turn, the officers turned on the flashing lights. *See* 5/6/21 Tr., at 19:20-22, 22:4-6. Hernandez pulled over. The record includes a map showing the area of the stop. *See* Gov.'t Ex. 3 (Dckt. No. 42-3); 5/6/21 Tr., at 20:24 – 22:3; 5/7/21 Tr., 19:19-25. The stop took place a little less than halfway between 25th and 24th. *See* Gov't Ex. 3.[7] It didn't take long to effectuate the stop. About 20 seconds (or less) passed between Officer Fosco

---

[6] In his motion to suppress, Avila offered a declaration from Fatima Hernandez. *See* Hernandez Dec. (Dckt. No. 18-5). She stated that she was, in fact, wearing a seat belt, and that she used her turn signal "long before" the stop sign. *Id.* at ¶¶ 5–6. Hernandez did not testify at the hearing. The Court considered her declaration, but does not find it persuasive. She did not appear, so she did not subject herself to cross examination. Her declaration is against the weight of the evidence, considering the record as a whole.

[7] If you look at the railroad tracks to the right, you can see railroad cars. *See* Gov't Ex. 3 (Dckt. No. 42-3). The distance between 25th and the location of the traffic stop onto Rockwell (*i.e.*, after turning north) is roughly equal to three or four railroad cars. Together, the railroad cars provide a poor man's yardstick.

turning right and then putting the car in park. *See* Fosco Video, at 1:50 – 2:09 (showing the stop sign, followed by a right turn and then putting the car in park).[8]

As the Dodge minivan slowed down, the officers saw a lot of movement by the front seat passenger. *See* 5/6/21 Tr., at 22:16-21. Officer Fosco testified: "I observed the front seat passenger making a lot of movement. His lower half was lifted from the seat, and it appeared his upper torso went back and forth towards his legs and back towards the seat at least two or three times." *Id.*; *see also id.* at 125:22-24 ("And as it was slowly rolling away, I could clear as day see the front seat passenger making a lot of movements."). Officer Cabello saw the passenger making movements, too. *See* 5/7/21 Tr., at 32:21-24. At that point, the officers weren't far behind – only a car length away. *Id.* at 22:25 – 23:2.

The audio from the bodycam begins about 10 seconds before the officers exited the vehicle. *See* Fosco Video, at 1:59 – 2:11. It captured their conversation. One officer said to another: "he's moving around a lot," "they're not stopping," and "the front seat's passenger is moving, right?" *Id.*; Cabello Video, at 2:04-06; *see also* 5/6/21 Tr., at 26:21 – 27:3; 5/7/21 Tr., at 24:20 – 25:6, 26:23 – 27:12.

The officers came to a stop, got out, and approached the vehicle. Officer Fosco walked to the driver's side, and Officer Cabello walked to the passenger side. *See* 5/7/21 Tr., at 30:16-19; Fosco Video, at 2:14-20; Cabello Video, at 2:09-20.

Officer Fosco asked Hernandez for her license. *See* Fosco Video, at 2:18-20. The video shows that she wasn't wearing a seat belt at that point. *See* Fosco Video, at 2:20-41.

---

[8] The officers testified that the Dodge minivan took a "prolonged amount of time to stop." *See* 5/7/21 Tr., at 24:2-15, 88:14-17. Whether Hernandez waited too long to stop depends on the context, such as whether there was a safe open space for Hernandez to pull over. Maybe Hernandez had plenty of opportunities to pull over, but took a pass and kept driving to give Avila a chance to hide the weapon. The bodycam footage doesn't shed much light on that issue. From a sliver of the bodycam, it appears that there were at least some other parked cars along the street. *See* Fosco Video, at 7:53.

11

Officer Fosco asked Avila if he had a weapon, adding that he saw Avila moving around in the vehicle: "Hey you were moving around a lot, man. Do you have a weapon on you?" *See* Fosco Video, at 2:20-25. Avila responded "hell no," and then cackled. *Id.* Avila, meanwhile, was holding a bag with his carry-out from Las Islitas. *See* Cabello Video, at 2:20-30. It was on his lap, pressed against his abdomen. *Id.* at 2:26-30.

Officer Fosco then asked them to step out of the car, explaining that they "didn't pull over right away" when the lights came on. *See* Fosco Video, at 2:26-28. Officer Cabello, too, asked Avila to get out of the car. *See* Cabello Video, at 2:28-30.

Both officers recognized the passenger as Refugio Avila, the Defendant. *See* 5/6/21 Tr., at 28:25 – 29:6, 52:17-23, 121:4-9; 5/7/21 Tr., at 30:21-25.

Officer Cabello knew that Avila was a member of the Satan Disciples. And he knew that the Satan Disciples were in the area, and had a history of carrying weapons and committing violence. He testified: "I do know that he was associated with the criminal street gang the Satan Disciples. I did know that we were in an area known for Satan Disciples to hang out. And I do know from past events as well as prior arrests that Satan Disciples are violent and they are known to carry firearms." *See* 5/7/21 Tr., at 31:8-12.

Officer Fosco also knew who Avila was, and knew his gang history. *See* 5/6/21 Tr., at 28:25 – 29:6. He testified: "I know that he was a Satan Disciple gang member from the 18th f[]action. . . . I've heard his name through Satan Disciple gang members that I've arrested in the past before. They've mentioned him multiple times." *See* 5/6/21 Tr., at 29:8-14.

As Avila stepped out of the vehicle, Officer Cabello noticed a large tattoo on Avila's forearm. *See* 5/7/21 Tr., at 124:10-20. Avila's right arm has a large tattoo that looks like a mix between a sword and a pitchfork. *See* Cabello Video, at 2:29-31. It's one of Satan's pitchforks.

12

*See* 5/7/21 Tr., at 124:10-20.  Avila's left forearm has a large tattoo, as well.  It looks like a fancy "D," kind of like the one used by the Detroit Tigers, but with a pitchfork in the middle.  *See* Cabello Video, at 2:29-31.  That's two tattoos with a weapon from the armory of hell.

Officer Cabello saw that Avila had a tattoo affiliated with Satan Disciples.  *See* 5/7/21 Tr., at 124:10-20.  That observation, plus Avila's movement in the vehicle right before the stop, heighted the officer's suspicion that Avila might have a weapon.  *See* 5/7/21 Tr., at 124:10 – 125:6.

As directed, Avila got out of the car, and Officer Cabello asked him once again if he had a gun.  *See* Cabello Video, at 2:33-35.  Avila said no.  *Id.*  The video shows that Avila was sitting on *top* of a seat belt.  *See* Cabello Video, at 2:35-41, 2:55 – 3:02; 5/6/21 Tr., at 93:1-9.  So, the seat belt was buckled – with no one inside it – and Avila sat on top of it.  When he sat, the waistbelt was behind him and under him, not around him.

Officer Cabello then performed a brief pat-down of Avila.  *See* Cabello Video, at 2:36 – 3:05.  Officer Cabello did so for safety reasons, given Avila's affiliation with a violent street gang.  *See* 5/7/21 Tr., at 31:22 – 32:9.

The pat-down took about 30 seconds.  *See* Cabello Video, at 2:36 – 3:05.  He began with the front pockets.  It didn't take the officer long to discover a large band or brace around Avila's abdomen.  Avila explained that he had a hernia.  *See* Cabello Video, at 3:00-06; *see also* Fosco Video, at 9:25 (giving a good look at the large hernia brace, after his arrest); Cabello Video, at 8:53 – 9:33 (same).  Cabello bellowed in response:  "*Ohhhh*, you have a *hernia*."  *See* Fosco Video, at 3:03-06; Cabello Video, at 3:00-03.

After Officer Cabello heard that explanation, he didn't do much of a search of the abdomen area.  In fact, once Avila said that he had a hernia, the pat-down pretty much ended.

13

The first pat-down involved Avila's waistline and pockets, but not much of his gut area (if at all). *See* 5/7/21 Tr., at 130:11-13. Based on the video, Officer Cabello did not do a visual inspection of Avila's abdomen (*e.g.*, by asking Avila to lift up the front of his shirt), and did not do any meaningful search of his front torso (if at all). *See* Cabello Video, at 2:36 – 3:05.

Avila then stepped aside, at the officer's request, and went to the back right of the passenger side of the vehicle. At that point, Officer Cabello performed a protective search of the minivan, looking for any weapons. *See* 5/7/21 Tr., at 34:4-8, 98:7-15.

The officer performed a protective sweep because he witnessed Avila moving around in the car when the lights came on, and because Avila was a member of the Satan Disciples. *See* 5/7/21 Tr., at 34:9-14, 99:18 – 100:8; *id.* at 100:5-8 ("I recognized who the passenger seat [sic] was. I understand he is affiliated with the criminal street gang the Satan Disciples. And like I said earlier, they are known for high violence."). Based on Avila's movements, he thought that Avila might have hidden a weapon in the car. *See* 5/7/21 Tr., at 95:20 – 96:3, 124:21 – 125:6. He didn't want to run the risk. "I'd rather be safe than sorry." *See* 5/7/21 Tr., at 34:13-14.

The protective sweep lasted about three minutes. *See* Cabello Video, at 3:08 – 6:19; *see also* Fosco Video, at 3:50-52, 3:59 – 4:06, 4:28-29, 5:09-15, 5:58 – 6:24. Or maybe a little less. That time includes walking from the front seat to the back seat, and then from the right side to the left side of the car, and then from the left side to the right side of the car. *See* Cabello Video, at 3:57 – 4:01, 4:26-36, 5:26-35.

Officer Cabello began with the vicinity of the passenger seat, including the glove compartment, the open box of Modelo beer (a 12-pack), the area under the seat, the storage area between the seats, and the compartment under the lift-up portion of the front passenger seat. *See* Cabello Video, at 3:08 – 3:52. That search took about 45 seconds. *Id.*

14

Officer Cabello then searched part of the back seat, meaning the area directly behind the front passenger seat, which was cluttered with several items of clothing and other personal belongings. *Id.* at 4:00-25. He searched that area because sometimes passengers will throw a weapon into the backseat during a traffic stop. *See* 5/7/21 Tr., at 34:20 – 35:1, 95:14-19, 125:13 – 126:6. That search lasted about 25 seconds.

The officer then circled the vehicle and accessed the driver's seat, and searched Hernandez's purse and the surrounding area. *See* Cabello Video, at 4:25 – 5:23. Sometimes passengers will hide weapons there, too. *See* 5/7/21 Tr., at 35:8-15. That search lasted about a minute.

So, in total, Officer Cabello searched the passenger seat area, and then the right side of the backseat (*i.e.*, behind the front passenger seat), and the driver's seat. He searched areas where the passenger could have reached. *See* 5/7/21 Tr., at 102:18 – 103:8.

And then, Officer Cabello searched the front passenger door, and then the front passenger seat area a second time. *Id.* at 5:35 – 6:19. He explained: "I was basically double-checking my work. I'd rather double-check than not check again. The old saying is, you know, measure twice, cut once." *See* 5/7/21 Tr., at 35:24 – 36:1. It lasted about 45 seconds.

Meanwhile, Officer Fosco interacted with Hernandez, the driver. *See* Fosco Video, at 2:34 – 3:03. She handed over her license. *See* Fosco Video, at 2:50-52. Officer Fosco told her that she didn't have her seat belt on, and that she needed to use her turn signal 100 feet before an intersection. *See* Fosco Video, at 2:58 – 3:03; 5/6/21 Tr., at 31:16-21.[9]

---

[9] It's not perfectly audible, but before Officer Fosco made that statement, it sounds like Hernandez asked, "Did I do something," or words to that effect. *See* Fosco Video, at 2:57-58.

15

Hernandez didn't dispute it. She didn't claim that she was, in fact, wearing her seat belt. *See* 5/6/21 Tr., at 136:10-25. And she didn't argue that she had used her turn signal properly. *Id.* Instead, she simply responded with an "oh." *See* Fosco Video, at 2:58 – 3:03.

As Officer Cabello performed the search, Avila stood close to the minivan, by the back right turn signal, with his gut to the vehicle. Officer Fosco asked Avila again if he had anything in the car, and told him that he was moving around a lot when they turned on the lights of the police vehicle. *See* Fosco Video, at 3:21-28. Avila responded that it was the food, meaning the bag of food that he got from Las Islitas. *Id.*

Officer Fosco then asked where Avila was in "SD," meaning Satan Disciples. *See* Fosco Video, at 3:28-31; 5/6/21 Tr., at 32:9-12, 105:18 – 106:2. Avila responded: "18th Street." *See* Fosco Video, at 3:28-31.

That's when Officer Fosco performed a pat-down of his own, meaning a second pat-down in addition to the one performed by Officer Cabello. It didn't last long, and it didn't cover a lot of ground. *See* Fosco Video, at 3:32-48. It lasted about 15 seconds.

Officer Fosco searched Avila's front pockets, and patted down his legs and groin area. *Id.* He basically searched below the waistline. *Id.* He briefly lifted Avila's shirt a few inches, above his left hip, revealing the hernia strap. *See* Fosco Video, at 3:34-36.

But he didn't do a search of Avila's abdomen area. *Id.*; 5/6/21 Tr., at 116:5-14. Officer Fosco did not perform a pat-down of Avila's torso (during this pat-down, that is). And he did not lift Avila's shirt to expose the gut area, either. He did not inspect the stomach area by touch, or visually.

In fact, before the second pat-down, Officer Fosco asked Avila about the hernia, saying something like "you said you got a hernia?" *See* Fosco Video, at 3:30-36. At the hearing,

16

Officer Fosco explained that he was "respecting his injury, his hernia." *See* 5/6/21 Tr., at 116:10-11.

Officer Fosco performed that second search to be on the safe side, just in case his partner had missed something. *See* 5/6/21 Tr., at 32:13-24. He testified: "I've had more than one occasion where an officer patted someone down and they missed something, and then I ended up patting them down and there was a firearm." *See* 5/6/21 Tr., at 32:17-19. And here, Officer Fosco wasn't sure how thorough the first pat-down was, meaning the pat-down by Officer Cabello. "I wasn't sure if my partner fully did a full pat-down or not. So I just wanted to just double-check based off the observations I've seen him making in the vehicle prior to him exiting. So I did another brief pat-down along the waistline and the pant legs for weapons." *See* 5/6/21 Tr., at 32:20-24.

Officer Fosco chatted with Hernandez and Avila at the rear of the vehicle while Officer Cabello continued the search of the minivan. Hernandez opened the back hatch door, apparently without any prompting. *See* Fosco Video, at 4:08-12. She later asked if she could close the back hatch door. *See* Fosco Video, at 5:36-38 ("Can I close it now?"). Officer Fosco asked Hernandez if there was anything in the back, telling Hernandez that she "really wanted me to close it." *See* Fosco Video, at 6:10-13. She responded, with arms waving: "You can open it. You can check whatever you want to check." *See* Fosco Video, at 6:13-17.

Officer Cabello completed the search of the car, and then asked Avila for his identification. *See* Fosco Video, at 6:24; Cabello Video, at 6:22-25. Avila didn't have any. So Officer Cabello asked Avila for his name, address, and date of birth, and jotted it down. *See* Fosco Video, at 6:24 – 7:00; Cabello Video, at 6:25-55.

17

Officer Cabello then returned to the unmarked car to run their names through the system. *See* Cabello Video, at 6:57 – 7:04; 5/7/21 Tr., at 36:7 – 38:12. That's typical practice for a traffic stop. *Id.* It's standard procedure to run the license plate, too. *See* 5/7/21 Tr., at 38:22 – 39:8.

While Officer Cabello started checking their names, Officer Fosco stayed with Avila, who was standing at the back of the minivan with another officer. *See* Fosco Video, at 7:00-28. Avila stood close to the vehicle, nearly hugging it, with his gut at or close to the back right turn signal. *Id.*; *see also id.* at 3:18-32, 4:09-50, 5:12-16, 5:22-5:56, 7:46-48; Cabello Video, at 6:21; 5/6/21 Tr., at 34:2-11, 37:1-3, 111:19-21, 126:19. He was a bit hunched over, embracing the minivan.

Officer Fosco became suspicious, based on how Avila was standing. *See* 5/6/21 Tr., at 125:3 – 127:4. "He was standing – it just appeared like he was – he wasn't turning his back or facing any of the officers. You know, he was constantly keeping his back turned towards the officers. And when he would talk, he would just look straight. Yeah, he was just standing – he was hugging the vehicle, like – I don't know why. It started to raise my suspicion maybe there was something he was trying to mask like in his stomach area." *See* 5/6/21 Tr., at 34:5-13. "The way he was just standing, it was just pretty unnatural, pretty weird." *See* 5/6/21 Tr., at 36:6-7; *see also id.* at 114:21-22 ("[T]here was something that just felt off the way he was standing."); *id.* at 139:10-11, 139:15 ("[H]e was standing pretty weird. . . . Something felt wrong.").

Officer Fosco concluded that he needed to pat-down Avila again, based on how Avila was standing. He explained: "I was just sort of watching him because – just – I know we patted him down twice, but just the way he was – just the way he was standing, it kind of – he just

18

appeared nervous and kept his back to us and just continued to really hug that vehicle. So part of me was thinking, you know, I might want to pat him down again." *See* 5/6/21 Tr., at 35:13-19.

He thought that the hernia band might provide a hiding spot for a weapon. "Because I know he had a hernia, and like he showed – he had like a little band wrap, but just for safety. And I just felt there possibly could be a weapon in there just the way he was acting." *See* 5/6/21 Tr., at 36:9-12; *id.* at 36:20-22 ("But, yeah, so I knew there was a band wrapped around his stomach, but the way he was standing, it made me believe that maybe there was something inside the band.").

Officer Fosco then walked over and joined Officer Cabello at the police vehicle. They talked quietly. *See* Fosco Video, at 7:28-44; Cabello Video, at 7:29-30. At that point, Officer Cabello was just getting started running their names and the license plate through the system. *See* 5/7/21 Tr., at 128:5 – 130:3. Officer Cabello had been in the vehicle for about 30 seconds.

Officer Fosco reported that Avila was "standing in a weird way." *See* Fosco Video, at 7:36-38; Cabello Video, at 7:32-34. Officer Cabello responded that Avila said that he had a "hernia." *See* Fosco Video, at 7:38; Cabello Video, at 7:34. There was a whisper, followed by what sounds like "want me to do it?" *See* Fosco Video, at 7:40-42.

Officer Cabello said "bring him up." *See* Fosco Video, at 7:42-44; Cabello Video, at 7:39-41. Officer Fosco then asked Avila to come over to the police vehicle. *See* Fosco Video, at 7:45-50.

Avila walked a short distance to the vehicle as directed. *See* Fosco Video, at 7:50 – 8:05. He offered a few profanities along the way, but in a relaxed kind of way (he was previously chatting with another officer about a funeral). *See* Fosco Video, at 7:48-57.

19

As Avila strolled from one vehicle to another, a bulge was visible in his gut area. *See* Fosco Video, at 7:49. And Officer Fosco noticed it. *See* 5/6/21 Tr., at 37:7-16. "And then, like I said, as he's walking towards me, you can see an outline in his stomach, and that raised my suspicions even more." *See* 5/6/21 Tr., at 37:7-9; *id.* at 115:6-7 ("I seen an outline of a band, but it looked like there was an object inside of it.").

Another officer seemed to spot something, too. A few other officers were on hand, and they stood around the two vehicles. One of them leaned against the front of the unmarked police car, and had a good look at Avila as he walked that way. *See* Fosco Video, at 7:50-55.

That officer apparently saw something in Avila's stomach area. The body cam captured the reaction. The officer looked at Officer Fosco, mouthed something, and gestured to his stomach, inquisitively. *See* Fosco Video, at 8:00-05. Maybe he mouthed "what's that," or words to that effect.

Avila ambled to the open door of the police vehicle, where Officer Cabello was seated. *See* Fosco Video, at 7:58 – 8:06. Officer Fosco stood behind him, a few steps away. *Id.* Officer Cabello thought that Avila was walking awkwardly. *See* 5/7/21 Tr., at 39:20 – 40:9.

A third pat-down ensued, and it didn't take long to find the weapon on Avila's stomach. Officer Fosco said: "You got nothing on you, right?" *See* Fosco Video, at 8:09-10. He approached Avila, stood close, and did a search of Avila's abdomen area. *See* Fosco Video, at 8:10-11. That is, he searched the spot where he spotted the bulge. *See* 5/6/21 Tr., at 39:1-12.

Within a few seconds, Officer Fosco found a firearm, tucked in the hernia brace surrounding Avila's belly. *See* Fosco Video, at 8:10-12. Officer Fosco said: "What is this, a gun right here? Yeah." *Id.*

20

The bodycam of Officer Cabello captured a picture of the gun. *See* Cabello Video, at 8:09. Officer Cabello took the gun and removed the magazine. *Id.* at 8:09-19. The gun was loaded, with a bullet in the chamber. *Id.*

The police then put Avila in handcuffs. Avila did not resist. *See* Fosco Video, at 8:12-35. As he placed the cuffs, Officer Fosco added: "I knew you were standing in a funny way, man." *See* Fosco Video, at 8:26-28; Cabello Video, at 8:23-25.

As Officer Cabello gently helped Avila into the vehicle, Officer Fosco spoke to a third officer. Officer Fosco explained that he had asked Avila to come by the police vehicle because he was "standing in a weird way." *See* Fosco Video, at 8:48-51.

The government later charged Avila with being a felon in possession of a firearm. The motion to suppress followed.

## Analysis

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. Const. amend. IV. Avila moves to suppress all evidence obtained during the traffic stop, on two grounds. First, Avila challenges the stop itself, arguing that the officers lacked a justification to pull over the vehicle. Second, Avila takes issue with the length and the scope of the search.

The Court will address each argument in turn.

## I.     The Stop

Avila begins by challenging the decision to pull over the minivan. Avila argues that the officers lacked a reasonable suspicion for the traffic stop. *See* Mtn. to Suppress, at 8-10 (Dckt. No. 27). The record supports the opposite conclusion. Based on the evidence at the hearing, the

officers had several reasons to pull over the vehicle, each of which is a sufficient basis for the stop.

The Fourth Amendment protects We the People from unreasonable searches and seizures. *See* U.S. Const. amend. IV. That protection applies to traffic stops, even though the restriction on liberty may not last long. A stop is a seizure. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809–10 (1996).

Police officers need a reason to pull over a car on the nation's highways and byways. The Fourth Amendment presumes a freedom of movement, so a "loss of our freedom to come and go as we please without police interference" is "a serious matter." *Navarette v. California*, 572 U.S. 393, 414 (2014) (Scalia, J., dissenting).

The Fourth Amendment requires officers to have a reasonable suspicion of criminality before directing a vehicle to pull over. "The Fourth Amendment permits brief investigative stops – such as the traffic stop in this case – when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette*, 572 U.S. at 396 (citation omitted); *see also United States v. Smith*, 32 F.4th 638, 641 (7th Cir. 2022) ("Under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), law enforcement officers may conduct brief investigatory stops if they have reasonable suspicion that a person is engaged in criminal activity."); *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc); *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020).[10]

---

[10] In his post-hearing brief, Defendant argued that the police did not have "probable cause" for the traffic stop. *See* Def.'s Mem., at 1, 16 (Dckt. No. 48). But the standard for a traffic stop is reasonable suspicion, not probable cause. *See Navarette v. California*, 572 U.S. 393, 396–97 (2014); *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc) ("Because traffic stops are typically brief detentions, more akin

"The 'reasonable suspicion' necessary to justify such a stop 'is dependent upon both the content of information possessed by police and its degree of reliability.'" *Navarette*, 572 U.S. at 397 (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). Reasonable suspicion "requires 'more than a hunch but less than probable cause and considerably less than preponderance of the evidence.'" *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (citation omitted); *see also United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021). And it "must be 'based on articulable facts' that the person stopped may be engaged in criminal activity." *United States v. Wilbourn*, 799 F.3d 900, 909 (7th Cir. 2015) (quoting *Terry*, 392 U.S. at 21).

The "ultimate touchstone" of the Fourth Amendment is "reasonableness," and reasonableness "is measured in objective terms by examining the totality of the circumstances." *Lange v. California*, 141 S. Ct. 2011, 2027 (2021); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). "When evaluating reasonable suspicion, courts must consider the totality of the circumstances – the whole picture." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (citations omitted). "To be reasonable, a traffic stop must be 'justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place.'" *Cole*, 21 F.4th at 427 (quoting *Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 185 (2004)).

Courts "do not consider an officer's subjective intentions" when deciding if a traffic stop passed constitutional muster. *See Tapley v. Chambers*, 840 F.3d 370, 377 (7th Cir. 2016); *see*

---

to *Terry* stops than formal arrests, they require only reasonable suspicion of a traffic violation – not probable cause."). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (citations omitted). A routine traffic stop is a "relatively brief encounter," so it is "more analogous to a so-called '*Terry* stop' than to a formal arrest." *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (cleaned up). Probable cause is sufficient, but not necessary, for a traffic stop – reasonable suspicion will suffice.

*also Whren*, 517 U.S. at 813; *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *Arkansas v. Sullivan*, 532 U.S. 769, 771–72 (2001); *United States v. Taylor*, 596 F.3d 373, 377 (7th Cir. 2010). "[T]he subjective motivations of the agents are irrelevant to the Fourth Amendment analysis." *Taylor*, 596 F.3d at 378; *see also United States v. Franklin*, 547 F.3d 726, 733 (7th Cir. 2008) (noting that it "would not entertain arguments based on the 'real' motivations behind otherwise lawful traffic stops").

The constitutionality of the stop does not depend on whether the driver did, in fact, commit a traffic violation. The standard is reasonable suspicion of wrongdoing. "If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution." *United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019); *see also Cole*, 21 F.4th at 428 ("The question . . . is whether Trooper Chapman reasonably believed that he saw a traffic violation, not whether Cole actually violated the statute.").

To pull over a vehicle, the police do not have to suspect the crime of the century. Even a broken tail light or some other modest traffic violation will do. *See United States v. Smith*, 32 F.4th 638, 639 (7th Cir. 2022); *United States v. Radford*, 2022 WL 2352762, at *4 (7th Cir. 2022); *United States v. Jackson*, 962 F.3d 353, 357 (7th Cir. 2020). A driving violation can lead to a traffic stop, even if the violation is, all things considered, "quite minor." *Smith*, 32 F.4th at 641; *see also United States v. Jackson*, 962 F.3d 353, 359 (7th Cir. 2020) (upholding a traffic stop about an air freshener hanging from the rearview mirror). When it comes to the Fourth Amendment, there is no such thing as a ticky-tack foul.

The record amply supports the conclusion that the officers had a reasonable suspicion of a driving violation. For starters, both officers testified that Hernandez did not use her turn signal at least 100 feet before turning right onto Rockwell. *See* 5/6/21 Tr., at 19:13-19, 87:15-23,

24

88:16-20, 90:17-23, 132:4 – 133:22; 5/7/21 Tr., at 14:23 – 15:6, 16:11-15, 17:14-21, 82:24 –

83:3, 104:21 – 106:16. That's a violation of Chicago Municipal Code 9-40-200(b). The Court

listened carefully to the officers, and found them credible.

Maybe that rule is, for most drivers, honored in its breach. One wonders how many

drivers know that they're supposed to use their turn signals at least 100 feet before an

intersection. However many people *know* the rule, the number of people who *follow* the rule is

undoubtedly less. (The reader can have a moment of quiet reflection and decide which camp he

or she is in.) Still, a failure to use a turn signal properly is a legitimate basis to pull someone

over, even if it doesn't seem like the biggest problem on the streets of Chicago.

The testimony received some corroboration from the video, too. Shortly after the stop,

Officer Fosco told Hernandez that she didn't use her turn signal at least 100 feet before the

intersection. *See* Fosco Video, at 2:58 – 3:03.

In response, Hernandez didn't put up much of fight. She didn't deny it. Instead, she

answered with an "oh," followed by a blank look. *Id.* Sometimes people protest too much. *See*

William Shakespeare, Hamlet, act III, sc. 2, l. 219. Here, Hernandez protested too little.

Defendant did not poke very many holes in the testimony that the police officers

witnessed a turn signal violation. Avila pointed to a few slight inconsistencies between the

officers' testimony, such as when, exactly, Hernandez turned on her turn signal (*i.e.*, whether she

turned on her signal at the stop sign, or as she was turning right). Any differences are

immaterial, at best, and do not call into question the key point: Hernandez used her turn signal

too late.

The violation involving the turn signal was enough to justify the traffic stop under the Fourth Amendment. But here, there was another reason to pull her over. Each officer witnessed a seat belt violation, and each violation provided an independent basis for stopping the minivan.

Officer Fosco testified that he saw that Hernandez was not wearing her seat belt. *See* 5/6/21 Tr., at 19:10-12, 22:7-10, 75:6-16, 80:13-25, 129:22-25. "We were behind the vehicle. I could see that the driver wasn't wearing a seat belt. I could see the seat belt flapping to the left of her, and it wasn't across her body." *Id.* at 19:10-12. The Court found that testimony credible.

The Court acknowledges that the Dodge minivan had tinted windows. And it was a sunny day. The dark windows and the bright sunlight would make it difficult to see into the vehicle. But not "impossible," as Defendant argues. *See* Def.'s Mem., at 20 (Dckt. No. 48). Defense counsel capably explored this issue on cross examination, and gave this Court some pause.[11] Still, after hearing the testimony, the Court concludes by a preponderance of the evidence that Officer Fosco saw Hernandez driving without a seat belt.

Once again, the video corroborated the testimony. The bodycam footage shows that Hernandez was not wearing her seat belt when Officer Fosco approached the vehicle. *See* Fosco Video, at 2:20-41. Hernandez stated in her declaration that she was wearing her seat belt while driving. *See* Hernandez Dec., at ¶ 13 (Dckt. No. 18-5). But she did not testify in person at the

---

[11] Defense counsel pointed to a picture of the minivan, taken from behind by one of the bodycams. *See* Def.'s Ex. 17 (Dckt. No. 41-17). It is admittedly difficult to see through the back windshield. Still, a picture does not always capture what the human eye can see. (Try visiting the Grand Canyon.) And a photograph does not always show the full picture. By way of example, take a look at the footage at 1:58 of the Cabello video. *See* Cabello Video, at 1:58. It shows the dashboard of the police vehicle, and the sky is bright white – almost blinding. Surely the sky was not bright white from the perspective of Officer Cabello. He undoubtedly could see something, even though the video shows nothing but all-consuming bright whiteness, the type of overpowering whiteness that one might expect when meeting your maker. A camera can't pick up everything that the eye can see. And there was no way for the Court to get its eyes on the minivan. As stated at the hearing, this Court asked about the possibility of seeing the vehicle for itself, to try to look through the back windshield. *See* 5/7/21 Tr., at 165:11 – 167:5. But Hernandez no longer owns it. *See* Def.'s Mem., at 21 n.7 (Dckt. No. 48).

hearing (neither party called her), so she did not undergo cross examination. *See* 5/7/21 Tr., at 163:22 – 165:1. And she did not explain why she was not wearing a seat belt in the video. The Court does not find her declaration credible.

True, the relevant time is when the police pulled her over, not when they walked up to the car. Maybe, just maybe, Hernandez unbuckled her seat belt after coming to a stop. But there is no such evidence in the record. And it seems unlikely, too. For most drivers, the instinct is the opposite. People tend to buckle up when the police arrive.

Later footage bolsters the conclusion that she wasn't wearing her seat belt. Officer Fosco told Hernandez that he pulled her over because she wasn't wearing a seat belt. *See* Fosco Video, at 2:58 – 3:03. Again, she didn't deny it. Hernandez never told the officer that she was, in fact, wearing her seat belt.

Officer Cabello similarly testified that he saw Avila riding in the passenger seat without a seat belt. *See* 5/7/21 Tr., at 16:23 – 17:8, 82:24 – 83:5, 85:19 – 86:24, 109:3-5, 110:10 – 111:20. "I noticed his seat belt was not coming across the body in an angle. I observed the seat belt coming more directly down, which alerted me that the seat belt was not on correctly." *See* 5/7/21 Tr., at 17:1-4. The Court credits Officer Cabello's testimony that he believed that the passenger was not wearing a seat belt, based on his first-hand observation.

Avila argues that Officer Cabello couldn't have seen what he claims he saw. *See* Def.'s Mem., at 22–24 (Dckt. No. 48). As it turns out, the seat belt was, in fact, buckled – and Avila was sitting on top of it. *See* 5/7/21 Tr., at 90:11 – 92:18; *see also* Cabello Video, at 6:12. That means that the strap was going from the top right of the passenger seat area to the lower left of the passenger seat.

27

If it appeared to Officer Cabello that the seat belt wasn't buckled, that observation wasn't actually the case.[12]  According to Avila, "[t]his fact alone means that neither officer could have seen from behind that Mr. Avila was not wearing his seatbelt and had no probable cause to stop the vehicle because of a seatbelt violation."  *See* Def.'s Mem., at 23 (Dckt. No. 48).

The existence of a mistake does not mean that the traffic stop was necessarily out of bounds.  It wouldn't delegitimize the stop even if Officer Cabello was mistaken.  The Fourth Amendment requires reasonable suspicion, not certitude and perfection.  It is enough if the officer reasonably believed that he witnessed a driving violation.  *See Cole*, 21 F.4th at 428 ("The question, however, is whether [the officer] reasonably believed that he saw a traffic violation, not whether [the driver] actually violated the statute."); *see also United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019) ("If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution.").  And here, Officer Cabello did.

The Court declines to find that Officer Cabello was wrong about the seat belt being unbuckled and was, therefore, lying about the whole thing (if that's the suggestion).  And, as it turns out, Officer Cabello was right about the core point.  Avila wasn't wearing the seat belt properly.  Seat belts are for wearing, not for sitting.[13]

---

[12]  Officer Fosco speculated that maybe Avila buckled his seat belt and sat on it after the police turned their lights on.  *See* 5/6/21 Tr., at 93:6-9.  After all, the officers saw him moving around, so maybe Avila was buckling up.  That theory seems unlikely.  After all, Avila – a convicted felon – was sitting in a car with a loaded firearm, and the police were about to walk up to the vehicle.  A seat belt violation probably wasn't the most pressing issue on his mind.

[13]  Officer Cabello's core point was that the angle of the seat belt did not look consistent with the passenger wearing it – it was going down, not across the body.  It is conceivable that sitting on a seat belt, instead of wearing it, could impact the angle.  After all, Avila is a large man, and he could have been sitting on the buckled seat belt in a way that pulled it down and made it look different than it is supposed to look.  But it is, frankly, hard to say.

Avila argues that the officers "made up their minds" to pull over the vehicle, long before witnessing any supposed traffic violation. *See* Mtn. to Suppress, at 9 (Dckt. No. 27); Def.'s Mem., at 16–18 (Dckt. No. 48); *see also* Def.'s Mem., at 1 ("They manipulated their unmarked car to pinpoint and follow him with the intent to pull his car over no matter what."). He relies on the actions of the officers shortly before the traffic stop.

Specifically, Officer Cabello had an opportunity to spot Avila – a known gang member – in the parking lot. When he returned to the unmarked car, with a Coke in hand, the officers circled the block and looked at the parking lot from a different vantage point. Officer Cabello motioned with his hand, possibly suggesting that Officer Fosco back up a little (which he did), as if they didn't want to be seen. And when the minivan left the restaurant and headed down 25th, the officers cut through the parking lot as if they wanted to close ground, and got right behind Avila's vehicle. And before long, one officer put his hand in the area where the emergency lights get turned on. The traffic stop soon followed.

As Avila sees it, the officers wanted to pull over the minivan all along because they spotted Avila, a known member of the Satan Disciples. After all, their whole mission that day was to stop the violence, and pulling over suspected gang members was part of that effort during their focused patrol. In his view, the officers were going to pull over the minivan after spotting Avila in it, regardless of what else they saw.

The Court concludes that the officers followed the minivan. It is hard to see any other reason why the officers circled the block, looked at the restaurant from a different direction, pulled back, cut through the parking lot, and got right behind Avila's vehicle. If there is some other explanation, the officers didn't offer it.

But the Court does not conclude that the officers lacked a basis in fact for the belief that Hernandez committed a traffic violation. Defendant starts from the notion that the police wanted to pull him over, and tries to jump to the conclusion that there was no reason to pull him over. On this record, that's a leap too far.

And again, the lawfulness of a traffic stop does not depend on the subjective motivations of the police officer. *See Whren*, 517 U.S. at 811 (rejecting the notion that "an officer's motive invalidates objectively justifiable behavior"). "Subjective intentions play no role" when deciding the lawfulness of a stop under the Fourth Amendment. *Id.* at 813; *see also Cole*, 21 F.4th at 428 n.1 ("We, of course, do not consider Trooper Chapman's subjective motivations for deciding to conduct a traffic stop."); *United States v. Chang*, 999 F.3d 1059, 1066 (7th Cir. 2021) ("[A] court need not delve into the subjective motivations of the officer who effectuated the detention."); *United States v. Edwards*, 769 F.3d 509, 515 (7th Cir. 2014) ("The reasonableness of a search does not depend on the officer's subjective motivations; the inquiry is, of course, *objective*.") (emphasis in original).

An officer may stop a car for objectively reasonable Reason X, even if the officer's subjective motivation is actually Reason Y. Police officers can hope to pull someone over, and then pull over the motorist for a traffic violation, even if the true motive for the stop is something else. *See Correa*, 908 F.3d at 214. If there was a legitimate basis in fact to pull someone over, then it makes no difference that the reason in the officer's heart of hearts was something different.

Even if the officers wanted to pull over Avila's vehicle because he was a gang member, that desire does not call into question the lawfulness of the traffic stop. That motivation is not enough to call into question the credibility of the officers, either. They testified that they

30

witnessed several driving infractions, and the Court credits that testimony. Those violations suffice under the Fourth Amendment.

In sum, after listening to the testimony, and considering the entire record, the Court concludes that the officers had reasonable suspicion to justify the traffic stop.[14]

## II.    The Search

Avila also challenges the search of the vehicle, and of his person. He argues that the officers had no need to search the car, and unnecessarily prolonged the search by looking for evidence of criminal wrongdoing unrelated to the traffic violation. At times, he suggests that the officers had no basis to pat him down for a third time.

The Court will address the search of the car, and then the final pat-down.

---

[14] The conclusion that the seizure was lawful has implications for the later search, too. A passenger has standing to object to a traffic stop, because the passenger, too, is seized. *See Brendlin v. California*, 551 U.S. 249 (2007). But a passenger ordinarily does not have standing to object to a search of the vehicle if the passenger did not have an ownership interest in the vehicle. *See United States v. Rodriguez-Escalera*, 884 F.3d 661, 667 (7th Cir. 2018) ("Typically, a passenger *qua* passenger lacks a legitimate expectation of privacy in a searched vehicle, unless he can show that he has some possessory interest in it."). A passenger can object to evidence found during a vehicle search, even if he lacked an ownership interest, if the stop itself was unlawful. *Id.*; *see also Brendlin*, 551 U.S. at 255–59. That is, if the traffic stop was unlawful, the passenger can challenge the ensuing search, too, because the seizure and the ensuing search never should have happened. But here, the car belonged to Hernandez, not Avila, and there is no evidence in the record that he has an ownership interest in his girlfriend's car. So, Avila has no standing to object to the search of the vehicle because the traffic stop was, in fact, lawful. "[A] passenger has standing to challenge evidence derived from an illegal stop but not evidence derived from an illegal search after a lawful stop." *Rodriguez-Escalera*, 884 F.3d at 667; *see also United States v. Wilbourn*, 799 F.3d 900, 908 (7th Cir. 2015) ("[B]ecause he was a passenger with no possessory interest in the car, he must demonstrate that the stop itself was not justified and that the evidence obtained was derived from an illegal stop (in contrast to an illegal search after a proper stop, which he would lack standing to challenge)."). Even so, this Court will walk through the analysis about the lawfulness of the vehicle search anyway, even though it appears that Avila has no standing to object to the fact of the vehicle search (meaning the fact that the search took place at all). That said, maybe Avila has standing to object to the *length* of the search, but not its existence. After all, the search took his time, too. A prolonged search would consume everyone's time, including the passenger's. Also, the Court assumes that Avila would have standing to object to a pat-down, because it was incident to the seizure, and because he has an interest in his own person (unlike someone else's car). All of this is a long way of saying that Avila may or may not have standing, so the Court will walk through the entire analysis.

### A.  The Search of the Vehicle

Avila's objection to the search of the vehicle comes in two flavors.  He argues that the police should not have searched the minivan at all.  And he objects to the length and scope of the search.

The video reflects when things happened, and how long they took.  Based on the totality of the evidence, the officers had more than ample justification to search the car.  And the search didn't go too far, or take too long.

To reset the table, the officers pulled over the minivan and walked up to each side of the vehicle.  Officer Fosco asked Hernandez for her license, and Officer Cabello asked Avila to get out of the car.  Based on the footage, Avila got out of the minivan at about the two and a half minute mark.  *See* Cabello Video, at 2:30.  Officer Cabello then conducted a brief pat-down of Avila, almost entirely from the waist down.  It lasted about 30 seconds.  *See* Cabello Video, at 2:36 – 3:05.

Officer Cabello then searched the car for about three minutes.  *See* Cabello Video, at 3:08 – 6:19.  Meanwhile, Officer Fosco performed a short pat-down of his own – lasting about 15 seconds – and then engaged in small talk with Avila.  *See* Fosco Video, at 3:32-48.  When he completed the protective sweep (*see* Cabello Video, at 6:19), Officer Cabello promptly took Hernandez's license and asked Avila for his name, address, and date of birth.  *See* Cabello Video, at 6:23-55.  Officer Cabello then walked to the police car.  *See* Cabello Video, at 6:55 – 7:04.

Not much later, Officer Fosco thought Avila was standing funny, so he walked over and told Officer Cabello.  *See* Cabello Video, at 7:32; Fosco Video, at 7:28-44.  They directed Avila to walk to the police vehicle, and Avila ambled over.  Moments later, Officer Fosco patted

Avila's abdomen and found the gun.  *See* Fosco Video, at 8:10-12; Cabello Video, at 8:09.  The time between Avila exiting the vehicle and the officers finding the gun spanned less than six minutes.  *See* Cabello Video, at 2:30, 8:10.

Police officers can search a car during a traffic stop when they have a reasonable suspicion that an occupant might have a weapon.  The Supreme Court poured that foundation decades ago.  "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons."  *See Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (citation omitted).

The Fourth Amendment requires reasonableness when it comes to the scope of the search, in time and space.  "It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.  A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  *See Illinois v. Cabelles*, 543 U.S. 405, 407 (2005) (citation omitted).

The Fourth Amendment does not create a stopwatch, or impose a fixed time limit on how long a search can take.  *See United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021) ("While officers must act diligently, we repeatedly have declined to adopt a rule of thumb that relies on the number of minutes any given stop lasts."); *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) ("The question does not depend on exactly how many minutes the stop lasts.  It

depends on whether law enforcement has detained the person longer than needed to carry out the investigation that was justified by the reasonable suspicion."). It depends on the unique facts of the case, from a boots-on-the-ground perspective. The standard, as always, is reasonableness.

The Supreme Court most recently addressed prolonged searches in *Rodriguez v. United States*, 575 U.S. 348 (2015). There, the police pulled over a motorist, issued him a warning, and completed everything necessary to finish the traffic stop. *Id.* at 351–52. And then, the officer asked the driver for permission to walk his dog around the vehicle and have a good sniff around. *Id.* at 352. At that point, the traffic stop had lasted about 22 minutes. When the driver refused, the officer decided to call the hound anyway. *Id.* Seven or eight minutes after the officer issued the warning, the dog detected drugs. *Id.* The overall stop lasted 29 minutes.

The Supreme Court held that a "police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Id.* at 350. "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop, and to attend to related safety concerns." *Id.* at 354 (citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed." *Id.*

Nothing in *Rodriguez* prevents police from taking the time to protect themselves. In fact, the Supreme Court recognized the government's "'legitimate and weighty' interest in officer safety." *Id.* at 356 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977)). "Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from *the mission of the stop itself*." *Id.* (emphasis added).

34

"Traffic stops are 'especially fraught with danger to police officers.'" *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)); *see also Maryland v. Wilson*, 519 U.S. 408, 413 (1997) ("Regrettably, traffic stops may be dangerous encounters.").  The existence of danger means that "an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez*, 575 U.S. at 356.  "Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." *Long*, 463 U.S. at 1049.

Staying alive is part of the mission.  The Fourth Amendment does not require officers to put themselves in personal peril.  Quite the opposite – the Constitution gives officers the time and space that they need to protect themselves when carrying out their duties.  When it comes to a traffic stop, a bedrock part of the mission is keeping the people who are performing the mission alive.  Officer safety is mission critical.

Based on the record, the Court finds that the protective sweep of the vehicle was justified and reasonable in scope, and that the officers did not prolong the search.  The Court has little trouble concluding that the decision to search for a weapon was reasonable, based on the facts at hand.  Again, the officers pulled over the vehicle in a high-crime area plagued with gang violence, including an active, ongoing, violent feud between the Latin Kings and the Satan Disciples.  *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.  Accordingly, we have previously noted

the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis.").

When the emergency lights came on, the passenger started moving around in a suspicious way. Both officers testified that they saw the passenger moving around. *See* 5/6/21 Tr., at 26:21 – 27:3; 5/7/21 Tr., at 24:20 – 25:6, 26:23 – 27:12. That testimony was credible. In fact, the video captured their spontaneous statements – in real time – that the passenger was moving around as they pulled over the minivan. *See* Cabello Video, at 1:59 – 2:11; Fosco Video, at 2:02-06. Moving around is something you might do if you were trying to hide a weapon in a flash.

When they approached the vehicle, the officers recognized Avila, a well-known member of the Satan Disciples. *See* 5/6/21 Tr., at 28:25 – 29:6. They knew about his membership in the gang, and they knew about the gang's long track record of violence in the neighborhood. *See* 5/6/21 Tr., at 29:8-14 ("I know that he was a Satan Disciple gang member from the 18th f[]action. . . . I've heard his name through Satan Disciple gang members that I've arrested in the past before. They've mentioned him multiple times."); 5/7/21 Tr., at 31:8-12 ("And I do know from past events as well as prior arrests that Satan Disciples are violent and they are known to carry firearms.").

Based on the evidence as a whole, the officers had a reasonable belief, based on articulable facts, that Avila might have a weapon. Reasonable suspicion requires looking at "the whole picture." *See Navarette*, 572 U.S. at 397 (cleaned up). Courts must take into account "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (cleaned up). Here, the location of the traffic stop, the existence of a gang feud, the movement by the passenger, the

36

identity of the passenger, and the membership in a violent gang created a reasonable suspicion that Avila might have a weapon. All things considered, it wasn't much of a stretch to think that the Disciple of Satan might be armed.

The decision to search the vehicle was reasonable. And the scope of the ensuing protective sweep was reasonable, too. The search of the minivan was not unduly prolonged. The search was not too long, and was not too broad. Based on the record, the Court finds that the officers were not "deliberately prolonging the traffic stop" or "intentionally delaying a drivers' license check." *Cf.* Def.'s Mem., at 29 (Dckt. No. 48).

Officer Cabello took a reasonable amount of time – and looked in reasonable locations – for a deadly weapon. The officer searched the passenger seat area (*see* Cabello Video, at 3:08 – 3:52), and then the backseat area right behind the front seat area (*id.* at 4:00-25), and then the driver's seat area (*id.* at 4:25 – 5:23), and finally the passenger seat area for a second time (*id.* at 5:35 – 6:19). Those are the areas right around the passenger. *See Long*, 463 U.S. at 1049.

The whole thing, from soup to nuts, lasted about three minutes. That's less time than it takes to brew a decent pot of coffee. That's not a lot of time when someone's life is potentially on the line.

It's true that police officers cannot extend searches beyond what is reasonably necessary. But it is equally true that the Fourth Amendment does not require what amounts to a hurry-up offense. The police can take a reasonable amount of time to do a reasonable search that is necessary to protect themselves. And here, that's what Officer Cabello did.

At times, Defendant calls attention to the fact that Officer Fosco chatted with Avila while Officer Cabello searched the vehicle. *See, e.g.*, Def.'s Mem., at 14, 28, 29 n.8 (Dckt. No. 48). The questions weren't related to the seat belts or the turn signal. *Id.* at 14. That's neither here

37

nor there. Officer Fosco simply conversed with Avila while Officer Cabello searched the vehicle. An "officer can ask 'wholly unrelated' questions while processing a ticket," or while performing other parts of a traffic stop. *See United States v. Goodwill*, 24 F.4th 612, 616 (7th Cir. 2022) (citation omitted); *see also Johnson*, 555 U.S. at 333 ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.").

The chit-chat didn't prolong the search. The conversation with Officer Fosco and the search by Officer Cabello took place at the same time. It is not as if the officers were dragging it out, and buying themselves time for some other reason (*e.g.*, while a police dog was on the way). What was he supposed to do, just stand there in silence? The Fourth Amendment did not require Officer Fosco to give Avila the silent treatment.

Defendant points out that other officers were on the scene, too. They weren't part of the stop *per se*, but they did join their fellow officers at the traffic stop. Avila points out that those officers were "standing around for over five minutes," and made no "effort whatsoever to investigate the alleged traffic violations." *See* Def.'s Mem., at 29 (Dckt. No. 48). If the suggestion is that the police could have gone faster, from a many-hands-make-light-work perspective, that suggestion goes nowhere. The Fourth Amendment "does not require perfect efficiency." *See Gholston*, 1 F.4th at 501 (Hamilton, J., dissenting).

Defendant overstates the scope of the search, too. The officers did not search the "entire car." *See* Def.'s Mem., at 2, 12, 14, 28 (Dckt. No. 48). Officer Cabello searched the front passenger seat area, and then the backseat area right behind the passenger, and then the driver's seat area. *See* Cabello Video, at 3:08 – 5:23. He did not search the backseat area behind the

driver. And Officer Cabello did not search the trunk area, either. Hernandez did open the back hatch, expose the rear of the minivan, and invite the officers to look wherever they wanted. *See* Fosco Video, at 4:07-12, 5:19-20, 6:13-17. Officer Fosco looked in the trunk area for a grand total of three seconds. *See* Fosco Video, at 5:26-29.

Defendant argues that the officers searched the car twice. *See, e.g.*, Def.'s Mem., at 15, 29, 31 (Dckt. No. 48). That's not quite right, either. Officer Cabello didn't search the whole car twice. He searched the passenger seat area twice. He searched that area once at the beginning of the search, and a second time at the end. *See* Cabello Video, at 3:08 – 3:52; *id.* at 5:35 – 6:19.

Officer Cabello offered a reasonable explanation for doing so. He explained: "I was basically double-checking my work. I'd rather double-check than not check again. The old saying is, you know, measure twice, cut once." *See* 5/7/21 Tr., at 35:24 – 36:1.

The passenger seat area was the most likely location for any weapon possessed by the passenger. Double-checking the area closest to the passenger – and thus the area most likely to harbor the passenger's weapon – was reasonable, from a belt-and-suspenders perspective. There is no one-and-done rule under the Fourth Amendment, especially when the officer harbored doubts about the adequacy of the initial search and wanted to double-check. *Cf. United States v. Smith*, 2019 WL 4242505, at *5 (N.D. Ill. 2019) ("A one-frisk-only rule would create a privacy-adverse Fourth Amendment incentive: an officer would lean toward performing the most intrusive frisk possible the first time around, knowing that no more would be allowed.").

And in any event, the second search of the passenger seat area didn't take much time. It lasted about 45 seconds. *See* Cabello Video, at 5:35 – 6:19. By any measure, that follow-up search did not "measurably extend the duration of the stop." *See Rodriguez*, 575 U.S. at 355 (quoting *Johnson*, 555 U.S. at 333). Most people can hold their breath longer than that.

Defendant believes that the search "included areas of the vehicle where Mr. Avila could not reasonably have hidden a firearm." *See* Def.'s Mem., at 31 (Dckt. No. 48). He points to the fact that the officer searched in "Hernandez's purse," in a backseat compartment "containing a bag," and under a floormat. *Id.* at 32.

That's not unreasonable. He looked there because they were reasonable hiding spots. Guns can fit in purses. And in bags. And under floormats.

At the hearing, defense counsel repeatedly hit the point that the officers could have issued Hernandez a ticket, and sent them on their way without searching the car or patting down Avila. *See, e.g.*, 5/6/21 Tr., at 107:12 – 108:11, 110:17 – 111:3, 113:10-14, 116:25 – 117:2; *see also* Def.'s Mem., at 2, 13, 31 (Dckt. No. 48). True enough. But that's basically saying that the officers could have completed the traffic stop without taking reasonable steps to protect themselves.

The Fourth Amendment did not require the officers to expose themselves to danger. Quite the opposite. Time and again, the Supreme Court has recognized the legitimacy of safety precautions to keep officers alive. *See, e.g.*, *Rodriguez*, 575 U.S. at 356 ("Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself. Traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely.") (cleaned up); *Long*, 463 U.S. at 1047 ("[W]e recognized that investigative detentions involving suspects in vehicles are especially fraught with danger to police officers."); *Wilson*, 519 U.S. at 413 ("On the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger. Regrettably, traffic stops may be dangerous encounters. In 1994 alone, there were

40

5,762 officer assaults and 11 officers killed during traffic pursuits and stops."); *Mimms*, 434 U.S. at 110–11 ("We think it too plain for argument that the State's proffered justification – the safety of the officer – is both legitimate and weighty."); *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) ("We have recognized that the first rationale – officer safety – is both legitimate and weighty.") (cleaned up); *Utah v. Strieff*, 579 U.S. 232, 241 (2016); *Arizona v. Johnson*, 555 U.S. 323, 330 (2009); *Brendlin v. California*, 551 U.S. 249, 258 (2007) ("It is also reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety."); *United States v. Robinson*, 414 U.S. 218, 234 n.5 (1973).  When it comes to officer safety, the Fourth Amendment does not require "safety third."

Defendant relies heavily on one particular passage from Officer Fosco's testimony.  He admitted that the officers were looking for evidence of a crime unrelated to the traffic stop.  Specifically:

> Q: You had patted – he had been patted down twice and the entire car had been searched, right?
>
> A: Yes.
>
> Q: You could have given him a ticket and let him go well before the third pat-down; would you agree?
>
> A: Yeah, I could've.
>
> Q: And the reason that you didn't is because you were looking for evidence of other criminal behavior unrelated to the traffic stop, right?
>
> A: Yes.

*See* 5/6/21 Tr., at 116:22 – 117:6; *see also* Def.'s Mem., at 27–28 (Dckt. No. 48).

Defendant views that testimony as "dispositive."  *See* Def.'s Mem., at 28 (Dckt. No. 48).  That's too strong.  Viewing the testimony as a whole, the officers testified they were looking for

a weapon.  A weapon wasn't the reason for the traffic stop.  So, in that sense, it was "unrelated to the traffic stop."  But searching for a weapon is legitimate when there is a reasonable suspicion that a passenger might have one.  And here, they had a reasonable suspicion.[15]

Defendant argues that the search was "untethered from the reason for the stop."  *See* Def.'s Mem., at 26 (Dckt. No. 48) (cleaned up).  Again, the need for officer safety is part and parcel of a traffic stop where, as here, there is a reasonable suspicion that a passenger might have a weapon.  Officer safety is not some extraneous, add-on consideration.  It is baked into the stop itself.

At times, Defendant argues that the officers were "motivated by a purpose other than enforcing traffic laws or conducting a protective sweep of the vehicle."  *See* Def.'s Mem., at 27 (Dckt. No. 48); *see also id.* at 32 (questioning Officer Cabello's "motivations during the search").  But again, the standard is objective, not subjective.  *See Wanjiku*, 919 F.3d at 487; *Tapley*, 840 F.3d at 377.  The constitutionality of the search depends on reasonableness under an objective standard, not on the subjective motivations of the officer.

In sum, based on a careful review of the record, the Court finds that the officers had a reasonable basis to conduct a search of the vehicle, and finds that the scope of the search was reasonable.

### B.    The Search of Avila

The final argument is about the search of Avila himself.  The officers patted down Avila three times.  That, too, was reasonable.

---

[15]  Counsel asked related questions that used the phrase "prolong the stop," and thus baked legal terminology into the question.  *See* 5/6/21 Tr., at 111:8-11, 113:15-18.  The Court considered such testimony, but did not find it convincing.  A fact witness may not grasp the legal significance of legal terminology, so it is important not to put too much weight on legal jargon, buzz words, and catch phrases.  Overall, the thrust of the officers' testimony was clear:  they took the time to search for a weapon, because they had reason to believe that Avila might have one.

Avila doesn't seem to take issue with the first two pat-downs. That is, he doesn't object to the first pat-down, by Officer Cabello. *See* Cabello Video, at 2:36 – 3:05. And he doesn't object to the second pat-down, by Officer Fosco. *See* Fosco Video, at 3:32-48. The second pat-down took place right after Avila confirmed which branch of the Satan Disciples he runs with. *See* Fosco Video, at 3:28-31. Avila responded: "18th Street." *See* Fosco Video, at 3:28-31.

At times, Avila appears to take issue with the third pat-down.[16] *See* Def.'s Mem., at 2, 27, 30 (Dckt. No. 48). If so, that objection lack merit. Based on the record as a whole, the Court concludes that the third pat-down (like the first two) was reasonable.

"The power to conduct a *Terry* stop does not automatically give police the power to frisk the subject for weapons." *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013). The legitimacy of a frisk is a "separate inquiry." *Id.* The phrase "stop and frisk" blurs the fact that the police must have a basis for a stop, *and* a basis for a frisk.

"To justify a patdown of the driver or a passenger during a traffic stop . . . the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Johnson*, 555 U.S. at 327; *see also United States v. Radford*, 2022 WL 2352762, at *6 (7th Cir. 2022); *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) ("For a frisk to be lawful, it must be based on reasonable suspicion that 'criminal activity may be afoot and that the persons with whom [the officer] is dealing may be armed and presently dangerous.'") (quoting *Terry*, 392 U.S. at 30) (alteration in original).

---

[16] It is not at all clear that Avila is, in fact, challenging the third pat-down. The argument doesn't appear to be that the police patted him down twice, so there was no need to pat him down a third time. Instead, the argument seems to be that the search was prolonged, which led to three pat-downs. Still, Avila flagged the fact that he was patted down three times, so the Court addresses the reasonableness of the third pat-down for the sake of completeness.

That suspicion must rest on identifiable facts, not a hunch. The officer must "hold a reasonable suspicion that the subject is 'armed and dangerous' as opposed to being generally suspicious." *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013). The officer must be able to "point to articulable facts that would establish the separate and specific condition that the detainee has a weapon or poses some danger." *Id.*

Certainty is not required. Reasonable suspicion is enough. "[A]n officer need not be certain that a person is hiding a weapon as opposed to drugs or other contraband before performing a pat-down." *Smith*, 32 F.4th at 642. That is, "[c]ertainty about the presence of a weapon is unnecessary; 'the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Ford*, 872 F.3d 412, 415 (7th Cir. 2017) (quoting *Terry*, 392 U.S. at 27).

Reasonable suspicion "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). Officers can draw upon everyday knowledge and common sense, too. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) (allowing officers to make "common-sense conclusions about human behavior") (cleaned up).

An officer can frisk someone more than once, too, depending on the situation. "[I]t is not necessarily unreasonable for police to frisk a person more than once when he has been seized on the rapidly evolving scene of police activity." *United States v. Howard*, 729 F.3d 655, 662 (7th Cir. 2013). Courts must ask "whether the frisk was reasonable on the facts known to the officer

at the relevant moment. There are many cases where a first frisk misses a hidden weapon, sometimes with consequences that are serious or worse." *Id.* A second frisk can be reasonable, for example, if one officer "had a credible reason to believe that [a different officer] might have missed a dangerous weapon." *Id.*

All told, "[t]he propriety of the second frisk turns on whether [the officer] had reasonable suspicion to believe that [the defendant], at the moment [the officer] frisked him, was a threat to officer safety." *Id.* "In other words, what happened between each frisk is crucial to the analysis." *United States v. Smith*, 32 F.4th 638, 642 (7th Cir. 2022).

The Seventh Circuit's recent decision in *Smith* is especially instructive. There, the police conducted a traffic stop after the driver ran a red light. *Id.* at 640. The officer directed the nervous passenger to get out of the car. *Id.* The passenger "immediately rested the front of his pelvis against the car, even though he had not been asked to do so." *Id.*

The officer performed a pat-down of the "hot spots" below the waist (but not the groin area), and found nothing. *Id.* But the officer "suspected right away" that the passenger "was hiding something in his pants." *Id.* He directed the passenger to walk to the police car, which the passenger did with a funny "side-to-side walk." *Id.* The passenger continued to rest his pelvis against the car. *Id.* Six and a half minutes after the stop, the officer jiggled the passenger's pant leg – the second pat-down – but came up empty. *Id.*

The officer then asked the passenger to walk some more. He walked with an "exaggerated limp." *Id.* One minute after the second pat-down, the officer performed the third and final pat-down. *Id.* He found a loaded gun. *Id.* Overall, 11 minutes passed from the beginning of the traffic stop to the discovery of the firearm. *Id.*

45

The district court concluded that the officer had a reasonable suspicion for each of the three pat-downs, and the Seventh Circuit affirmed. The officer had a basis for the second pat-down, given that the passenger "repeatedly rest[ed] his pelvis against the cars as if to prop something up." *Id.* at 642. The third pat-down was justified, too, given the passenger's "exaggerated limp." *Id.* at 643.

Against that backdrop, the Court has little trouble concluding that the third pat-down was justified. Again, Avila was not a run-of-the-mill passenger. He was a well-known member of the Satan Disciples. The Satan Disciples is not known as a group of choir boys. It's a violent street gang.[17]

Avila didn't exactly hide his embrace of the group. Avila had a special haircut – a "shag" – that is "known within Hispanic gang culture." *See* 5/6/21 Tr., at 45:10-11. He also had tattoos with Satan's pitchfork, signifying his long-term commitment to the gang. *See* 5/7/21 Tr., at 124:10-20.

Avila admitted to Officer Fosco during the stop that he was a member of the Satan Disciples. And the stop took place on the turf of a gang battleground. So, the police pulled over a prominent, all-in member of a violent gang in a dangerous neighborhood. The situation suggested potential danger from the get-go.

Avila's later conduct added to the suspicion. Officer Fosco witnessed Avila standing in a peculiar way, hugging the vehicle. "He was standing – it just appeared like he was – he wasn't turning his back or facing any of the officers. You know, he was constantly keeping his back

---

[17] Avila's membership in a violent street gang has an obvious bearing on the possibility of violence and on the likelihood that he was carrying a weapon. Think about it this way. Imagine if you were in a parking garage in downtown Chicago, by yourself, and you were going to hop on an elevator. And you had a choice. You could ride in an elevator with someone who is a member of Satan Disciples. Or you could ride in an elevator with someone who is not a member of Satan Disciples. Who would you pick?

turned towards the officers. And when he would talk, he would just look straight. Yeah, he was just standing – he was hugging the vehicle, like – I don't know why. It started to raise my suspicion maybe there was something he was trying to mask like in his stomach area." *See* 5/6/21 Tr., at 34:5-13. "The way he was just standing, it was just pretty unnatural, pretty weird." *See* 5/6/21 Tr., at 36:6-7; *see also id.* at 114:21-22 ("[T]here was something that just felt off the way he was standing."); *id.* at 139:10-11, 139:15 ("[H]e was standing pretty weird. . . . Something felt wrong."). Avila seemed nervous, too. *Id.* at 35:13-22.

When the officers asked Avila to walk to the police vehicle, they spotted something, too. Officer Fosco saw an outline of an object – a bulge of some kind – on Avila's abdomen. *See* Fosco Video, at 7:49-56; *see* 5/6/21 Tr., at 37:7-16, 115:6-7. "And then, like I said, as he's walking towards me, you can see an outline in his stomach, and that raised my suspicions even more." *See* 5/6/21 Tr., at 37:7-9.

A third officer on the scene saw it too. The footage shows him gesturing to his stomach area, and mouthing something to Officer Fosco, apparently letting his fellow officer know that he saw something on Avila's torso. *See* Fosco Video, at 8:00-05. As Defendant admits, that officer spotted something while Avila walked from the minivan to the police vehicle, after the second pat-down and before the third pat-down. "Officer Emil Hageline [*i.e.*, a third officer on the scene] noticed a bulge in Mr. Avila's shirt and alerted Officer Fosco." *See* Def.'s Mem., at 15 (Dckt. No. 48).

Viewed as a whole, the record supports the conclusion that the officers had a reasonable basis for a third pat-down. Avila is a member of a violent street gang. He moved around when the police turned on their flashing lights. He acted in a peculiar way, hugging the vehicle as if to conceal something on his torso. *See Smith*, 32 F.4th at 640 (finding that a pat-down was

reasonable when the passenger "immediately rested the front of his pelvis against the car, even though he had not been asked to do so"). He seemed nervous. And when he walked from one vehicle to another, two officers saw a bulge on his abdomen. That's more than enough of a factual basis for a third search.

The third pat-down was especially reasonable given that the first two pat-downs were relatively cursory. The first pat-down lasted about 30 seconds, but Officer Cabello didn't search Avila's abdomen after he discovered the brace, and after Avila declared that he had a hernia. *See* Cabello Video, at 2:36 – 3:05. The second pat-down lasted about 15 seconds, and didn't cover his torso, either. *See* Fosco Video, at 3:32-48.

So the first two pat-downs left ground to cover. And the third pat-down was minimally invasive, too. It lasted only a couple seconds. Once the officer touched his torso, he found the weapon almost instantly. *See Smith*, 32 F.4th at 642 (holding that a second pat-down was reasonable because it was "minimally invasive").

Avila points to testimony from Officer Fosco, reading it to suggest that he did not fear for his safety before performing the third pat-down. *See* Def.'s Mem., at 14 (Dckt. No. 48). The testimony is ambiguous – counsel asked "am I right" that Officer Fosco wouldn't have done X if he had thought Y, and he answered "No." *See* 5/6/21 Tr., at 114:15-18. No, what? No, you're not right? Or no, he wouldn't have done X?

In the end, it doesn't matter. Again, the standard is objective, not subjective. The question is whether "in light of the facts available to the officer at the time, a reasonable officer would have believed that the person was armed and dangerous." *See Smith*, 32 F.4th at 643. Here, abundant facts supported the reasonable belief that Avila was hiding something.

Based on the record, the Court concludes that the officers had a reasonable suspicion that justified each of the pat-downs, including the third pat-down that preceded the discovery of the firearm.

## Conclusion

For the foregoing reasons, Defendant's motion to suppress is denied.

Date:  July 19, 2022

_____

Steven C. Seeger
United States District Judge